Here ye, here ye, this Honorable Appellate Court for the Second Judicial Dissert is now by procession with the Honorable Mary S. Shostakovich presiding. You can be seated folks, thank you. Your Honor, the second case in the Doctrine of the Court is 2-24-0551, Michael J. Grudecki v. Young, defendant's appellate. Argument won't be kept from the appellate, Mr. James P. Newman. Argument won't be kept from the appellate, Ms. Chantelle Crick. Good morning folks. Mr. Newman, are you prepared to proceed? Come on up. Good morning, may it please the Court. Good morning. My name is Joe Newman, I represent the plaintiff appellate. This is an automobile accident, a negligence case. The two primary issues in this case deal with facts through either request to admit facts or through a J&OV motion after what was elicited from trial. The other issue deals with evidence that was allowed into trial. I'm going to first talk about the facts. And in this case, after the, again this is a simple automobile accident case. Is this an admitted liability? Eventually, yes. So what had happened, we had taken the age of the complaint. Typical case, this was before COVID. This case got dragged out because of COVID. But before COVID, moved along the line. The parties took the treating, two treaters' depositions. And after that, the plaintiff and myself served a request to admit facts upon the defendants. And these facts were dealing with two primary subject matters. One was lost wage claim, and the other was the medical bills and the injuries that were contained and elicited through discovery and contained in the records. The defendant had basically denied the vast majority of the request to admit. And through some minor motion factors, eventually, I think the original answers were stricken for this or that. The defendant eventually admitted negligence and then admitted that the medical bills were paid but denied causation. So there was a causation issue that was going to be heard for trial. The defendant never presented any evidence in this case. Does he have to or does she have to? I mean, the law is pretty clear as long as there's a dispute. And there was a dispute, correct? No, there was not a dispute on causation. There was an argument on causation. We're talking about the damages. Yeah, but not the non-economical damages. That's the key here. That's just what we're here. We're not here talking about whether or not this case should have received $200,000 for pain and suffering. What we're talking about here are the medical bills, which were around $30,000, and the lost wage claim, which was around $10,000. Those are non-economic damages. Let's talk about those lost wage claims. Sure. He was on a salary, correct? Correct. His salary was $146,200. And he says that he used his PTO for a lot of his absences. Correct. Did he have to or did he do this on his own accord? I mean, did the business say or the company say, oh, you have to use PTO for that? I don't want to give a false answer to this. I don't think he was ever asked that question. But based upon his testimony in totality, yes, and from my own experience, I'd say yes. If he missed work, he had that PTO. Otherwise, it would have been docked from his pay. Well, the long and short of this, and you say they're non-economic, but that goes to his credibility, doesn't it? I mean, a lot of the testimony about his lost wages, he talked about the medical records and when he had his appointments, what time he went to the doctors, and that's how he determined the hours that he had to use to take off work. But there was not really much testimony from anyone other than him about a lot of this stuff, and a lot of it he said my husband kept track of this. So isn't this credibility? If the jury doesn't believe him, the jury doesn't believe him. The jury did believe him because the jury awarded 100 percent of all of the medical bills. So they determined that all of the medical care that he sought was related to the accident, number one. Number two, he has to go to the appointments. The doctors don't make house calls out of his work. So the testimony – I understand that, but with respect to lost wages, we don't know if they believed him or didn't believe him. That's the point. There was nothing not to believe. The evidence that was presented in the case law I cited, he can get up there and testify. There's plenty of case law out there. He can get up there and testify. In fact, one of the cases I cited, the person didn't even have a job. He had just accepted a job and hadn't started working. And his testimony was all he had. He went up and said, I was supposed to start work next week, and I couldn't work. And the judge said, you're not going to be able to present that. And the appellate court said, absolutely. And everything goes to him. His testimony alone is enough. And that gets to Your Honor's question about proof. When you have a request – when you have a fact which is presented to make a fragmentation case, of course the defendant doesn't have an obligation to prove a negative. But if the defendant on a request to admit, as an example, if I argue that the wife is – or, you know, I missed Saturday from work and that everyone testifies to that, whatever it may be, and you know that's the case and you deny it, that's the whole reason why the request to admit has ramifications in it. Go ahead, Justice. Well, so you're talking about the RTAs at this point? I mean, I was going to ask the question, I mean, about the verdict itself. I know you also complained about it, and I understand what you're saying. He got his bills. Therefore, according to you, he should have got all the lost time. But can't the jury determine that you didn't prove by a preponderance that it was reasonable and necessary to take that much time during his workday? He shouldn't – I guess my concern is this is the jury's verdict. They heard, as Justice Shostak pointed out, they heard him testify. There was, you know, plenty of controversy about how he kept the records, what he really knew, what he really remembered. I feel concerned that we would have to defer to the jury's verdict on that. But the second thing is, is it – and I, you know, I – this is a hard-fought case, and I commend both of you for your vigor representing your client. But the denial of fees for the denial of the RTAs, is that abuse of discretion? And isn't it the proof in the pudding? The bottom line is for the lost time. The jury didn't believe it. I mean, I think it's arguable. It's a good argument the jury just didn't believe it. So therefore, the trial judge was not abusing his discretion in denying fees for the RTAs. So there – And I know there's a lot in there. I think the audience said it. So as far as the lost time, there was no dispute with respect to the lost time. There was an argument being made, but the argument was – the argument was suspicious, and here's why. Here's what the evidence showed. And there was a chart that was admitted in the evidence for his time off. It's not like he – this is not a case in which somebody – how they originally defended this case. If you look at – if they go back and look at the response to my motion for summary judgment, even the trial, they treated this as an – This is his motion for summary judgment. On the issue of the motion for summary judgment as it relates to the lost wage claim. Their original defense to this, and it's even contained in the deposition of Mr. Rudecky, in the questioning that they asked him, they assumed wrongfully that his lost wage claim was something to the effect of I was injured and I was unable to work for two weeks. That's not what the case was. It was he had to take off of work in order to go for treatment. And that is recoverable. So getting to your point on the timeframe, he listed contemporaneously every day that he took off of work and the time that he was – he testified that he had – he worked from Chicago. He worked in Chicago and had to come – And you're right that his testimony alone, if believed, is sufficient. But I guess, you know, my concern is that the jury didn't believe it or believe that you had proven it to the standard required. So with all due respect, I don't think there was anything for the jury not to believe. Because otherwise they would have to think that somehow that Mr. Rudecky either didn't take time off of work to get there or that in coming from Chicago to Geneva, he was able to get there in a matter of seconds through some type of travel. Did he show documentation from the company that they paid him or didn't pay him for that time, that he had to take PTO? Every – yes. Well, in the sense of all of his financial records from the employer were produced in discovery through subpoenas. But he testified that his husband handled the finances. The finances, yes. He said the billing documents would go directly to the husband and he rarely saw the documents. He also said he was – he would have been paid out of unused PTO, but he never saw the final paycheck from his company that would include or not include the payout because his husband handled that. So the jurors might have thought, well, he doesn't know if he got paid or didn't get paid of that PTO. He never swayed from the fact that he didn't get – and I cite his testimony. But did he have documentation from his company that they paid him PTO or didn't pay PTO for when he went to those appointments? So that's not the way that PTO – it doesn't work that way. PTO isn't paid or not paid. PTO is in lieu – PTO is in lieu of them reducing your pay. Is that what you mean? Correct. That's what you mean. So, yes, he didn't lose – he didn't lose any pay during the week because they used his PTO for his time. And he was on salary, so do we know that they even used his PTO? Yes, because he testified when he left the work. He had a few hours that he got paid and he didn't get paid. He had accumulated 140 hours, which is basically three weeks of PTO time. He didn't get – his testimony was consistent. He showed them proof of that. The proof? If such proof existed, it was produced by way of subpoena through the records. All of his records were produced. His tax returns were produced. Everything was produced. At the end of the day, as I think – I cite these two cases, O'Leary and Kelley. Those are the two cases I think that are all points for lost wages. The testimony itself is enough to meet that burden. If it's believed. But there's nothing – in order for something to be contested, there has to be something else to believe. There has to be some other kind of evidence. There's nothing not to believe in a lost wage claim. You know, I understand he was impeached on his memory, on the spreadsheet, on the documents, the trial court. He was not impeached. Excuse me if I'm wrong on this, because I might be, but I understood the trial court denied your motion for summary judgment on lost time because it was a contradiction between the spreadsheet and his deposition. No. The quote from the judge I have written down here was the same thing, denying summary judgment and J&OV, in that his testimony was self-serving. That is an abuse of discretion, because that's not within the standard of what needs to be proved. Every affidavit that's ever been presented in court is going to be self-serving. Otherwise, you're not doing your job as an attorney. Your testimony, when you get it there, is always going to be self-serving. Otherwise, you're not doing your job as an attorney. That is not the standard, and that's what the judge based his ruling on, and that was the argument in writing from the defendant. I'm willing to talk about the permanent injury aspect, because it's the same thing. You had testimony, in this case, there were three doctors, medical testimony, that testified on my client's shoulder pain and the concussion and the headaches. It was uncontroverted. First of all, their expert opined, I don't have any opinion regarding headaches. So there was nothing there. The only thing the jury heard, the only thing that the judge heard in the motion for summary judgment, was in the medical records. He had a concussion as a result of this. Everyone agreed to that. He had continued headaches as a result of this. Everyone agreed to that. The shoulder pain, everyone agreed to that, including their own expert. Wait a minute, wait a minute. How about the medicine ball incident? When this medicine ball incident occurred, was he working out? Was he doing physical therapy? He was working out.  Yes. And so the medicine ball injury was in June of 23. So it was after the incident, but before the trial, correct? Yeah, about five years after the accident, yes. So would that create some question to the jury with respect to permanency in shoulders? It does not because all of the doctors testified because of his pain in his shoulder had lasted as long as it did. And their depositions were two years prior to that incident. But they didn't know about it. No, but it hadn't occurred. The permanency was already there because it was the length of time between the accident and the pain that was the opinion of every doctor, including their own expert, that the pain was permanent because it did not get better. Pain will get better this plateau and it stays the same. The medicine ball accident is a red herring. Yeah, sure, sure. It is a red herring. It has nothing to do with this case. They tried to make an argument that he suffered another concussion, and that was debunked by the doctor himself. I did not diagnose it with a concussion, and by the witness and the doctor, no one ever told Mr. Brudecki that he suffered a concussion as a result of the medicine ball incident. There was something contained in the record, but it didn't say he suffered a concussion. It said he had resolved concussion-type symptoms. Right. So the idea that that was somehow deceptive was a red herring. No, and I understand what you're saying, Mr. Newman, but you have to understand this was a jury hearing this. So they could, I mean, if the law was so clear cut, then, you know, maybe a bench trial would have been better off. But when you have a jury and they have different things coming, it might be red herrings, but to a jury, that's what they're hearing, and they're going to use that to base the determination and the, excuse me, the credibility of the plaintiff. And maybe they didn't like the plaintiff. I mean, all of these things go into a jury verdict, don't they? Judge, in order for Your Honor to talk about jury not liking, the jury would have not had to have liked every single medical doctor who testified, including their own expert, who all said he had permanent pain in his shoulder and he had a concussion. This is, with all due respect, this is not about whether or not the jury believed my client. There's evidences in a box, and you don't get to, and what has happened here, what the trial judge did and what the defendant is about to do and did at trial is going to make an argument. Argument is not evidence. So you think the injury wasn't subjective? I don't think it's, no, I don't think it's, unless you're going to say medicine itself is subjective. I think it's, if a medical care provider provides a proper opinion, you lay the foundation, and that's uncontroverted. Do I think the jury can ignore that? No. I don't think that, that's the whole reason why, that's the whole reason why you have a JNOV. The vast majority of cases dealing in negligence with JNOV is the jury ignoring medical providers' expert opinions. But don't, did I misapprehend Dr. Morrow's testimony? I understood Dr. Morrow said the shoulder is fine now. No, no. I'll tell you the page, page, in the record. He said it's a permanent record that the plaintiff continues to suffer from. I definitely misunderstood Dr. Morrow's testimony. As it relates to the injury was there was not permanent in the flexation. The pain aspect of it he agreed, and it's on page 1618 of the record, and also on page, I think, 191 of the record, that he says that the pain he had was related and that it was not going to resolve. He was at his maximum medical improvement. You see that turn a lot. When asked what that means, he said he'll be able to deal with the pain through physical therapy, medicine, injections, and things like that. It's still there. I think you've answered that question. I have a question. You kept arguing, you mentioned several times the trial court's denial of the motion for summary judgment. Did you appeal that ruling in your brief? Yes. Well, you can't because the case law says that it's rolled into the trial court. I raised it only because of the request to admit, showing that throughout this case, the plaintiff, myself, has tried to get this case, if it's going to go to trial, on issues which are contested to eliminate the costs and expenses. What Rule 191 was designed to do, it has specific remedies in line for. Throughout this case, from the very beginning, having to file motions to compel the request to admit to be answered and so forth and so on, and going through trial with zero facts presented to contradict the facts. Again, the jury, this will be my final point. When we're talking about requests to admit, the requests to admit were in 2018 that were sent out. If I'm not mistaken, I think it was 2018. The trial was in 2024. What's lost on the defendant and the trial judge, when I serve a request to admit in 2018, those are answered in 2018. So the notion that in 2018, basically what the defendant and the trial judge has said and argued here is, in 2018, rather than admit or deny it, the response was, I want to wait and see what happens at trial and be able to cross-examine a witness in that case for six years in the future to see whether or not they're going to contradict what they already testified to in their discovery deposition. And that's exactly what happened here. And that's not permitted under Rule 191. And during the opening statement, and I think the evidence poured out, the attorney for the defendant mentioned to the jury there was a six-year gap in the treatment. No, no, there wasn't a six-year gap. Five years. There was a gap. There was a gap. There were two treatments. That's a better way to say it. He was treated right out of the accident. And then he had reached the maximum that they thought he was going to get. He was still in pain. He was still discharged from pain. And then it got worse and he went back. And then he went to, I think that's when he went to the neurologist. Everybody agrees. Every doctor agreed, even their own expert. All of it's related, even their own expert, related to the original accident. That's, again, another red herring. So that goes through what I said before. Argument is not facts. And they're arguing against their own expert. Thank you. So you'll have an opportunity for rebuttal. Thank you. Sure. Ms. Peretz. Justices. Sorry. May it please the Court. Conso has stated that we're here for two primary issues, as in his brief there were three. I'm going to address first the lost wages issue and that being with plaintiffs, saying that the Court erred in denying the JMOV. Did you present any evidence regarding the lack of lost wages or anything about the lost wages? In terms of lost wages, my evidence would have been in direct examination of the plaintiff with respect to this spreadsheet. That was not admitted into evidence as Conso keeps on stating in his brief as well as here. And I will ask the Court to actually look at the Court's, as he puts it, Exhibit 4, Plaintiff's Exhibit 18. In the Common Law Record 1571, the Court's Exhibit sheet, it is clearly marked that the plaintiff's salary was used as a demonstrative exhibit, and it was not admitted into evidence. So when referencing that spreadsheet and discussing it with plaintiffs and asking him questions on cross-examination, there are several different hours listed. There are not days listed. The first time plaintiff had ever discussed using sick time or vacation time was at trial. And Conso states all the documents were subpoenaed. All the documents were subpoenaed. They subpoenaed and they have all these documents. Yes, we subpoenaed the employer's records. And nothing in there showed that he had used any sick time, any vacation time, anything to that effect. There was no documents that were presented by the plaintiff other than his own testimony in the exhibit. In the page, I'm sorry, in the demonstrative exhibit, which was not shown to the jury. It was just referenced. Furthermore, plaintiff was asked about this 15 hours of miscellaneous time in this spreadsheet as he, and actually Conso is incorrect that the Court stated that plaintiff's testimony was self-serving. That is incorrect. He was stating that the affidavit of which the plaintiff had attached to his motion for summary judgment, not sure which one because there were two, it was that document that he found to be self-serving because it contradicted his prior testimony, his discovery deposition. If you could do a self-serving affidavit, if you could attach it, everybody would be doing it. Absolutely. And in that affidavit, which obviously the jury had heard, he's stating all of the hours that he listed on there were contemporaneous to medical treatment. Then you have a line item of 15 hours of miscellaneous that isn't part of any treatment. So it's that testimony by the plaintiff of which, yes, the Court had to weigh the credibility and did not believe him. And Conso is correct that in his brief, he does cite a case law and automatically assumes that because the plaintiff has testified that, you know, I had missed these hours, it says if the jury believes that person. Furthermore, there were inconsistencies. Did you present any evidence regarding the lack of permanency for the plaintiff's headaches? As for lack of permanency for the plaintiff's headaches, again, any of the evidence was based on, first, the cross-examination of plaintiff when asking him. He was asked previously in his discovery deposition whether or not or when his headaches had subsided, of which that was two weeks. Of course, at trial, we're going eight years later, they never subsided. Furthermore, in terms of the testimony of Dr. Satwani, it was interesting, I think, and the jury hearing this, one plaintiff is stating it waxes and wanes. Then you have Dr. Satwani stating that, well, okay, the pain, just like all the doctors, cannot objectively say whether or not a patient has pain or not. It is a subjective complaint. But Dr. Satwani was never aware of the June 2023 concussion, of which Conso is stating there was never a diagnosis. It was a diagnosis. Dr. Rivers diagnosed it. It was in the medical records. Even Dr. Rivers, when on cross-examination, asked him, you did diagnose it. Whether or not it was, you know, he confirmed it 100% thereafter, but it was a diagnosis he had. But also he failed to, plaintiff failed to even tell Dr. Satwani, even if we don't want to consider concussion as a diagnosis, he didn't even tell him, hey, guess what, in June of 2023, before coming to see you here, I actually hit my head. The medicine ball hit my face, I fell back, hit my head to the ground, which is an important fact for him to say whether or not there was pain. None of the doctors testified, yes, that there was any objective evidence to support this permanency of pain, with respect to the headaches as well as that left shoulder. Why did it take so long for Dr. Mirra to disclose the supplemental opinion? I mean, Dr. Rivers' supplemental opinion was in December of 23, and Mirra's supplemental was in, I think, April of 24. And so in December of 2023, that is when plaintiff had treated with his primary care doctor, Dr. Rivers. I was only provided, and I believe I was provided in January of 2023, that patient portal record. Which is where you discovered the medicine. Well, no, I did not. The patient portal record will only give you, here's some treatment, nothing more, and then a letter from Dr. Rivers, which is interesting, written in there, oh, all of this is related, and he had pain from this, and there's this percentage of a deficit. So obviously I have a right to subpoena those records when I subpoenaed them, not produced by plaintiff. Which was when? I had subpoenaed them right after I had reviewed that, which was, if I'm not mistaken, either February is when I did so. I had subpoenaed them, received those documents, and it was at that time that I had seen the June 2023 incident. It was never disclosed to me. Obviously plaintiff would have this information. And it was at that point when I sought to take Dr. Rivers' deposition and re-depose him, as he now has an additional 5% deficit, which I believe obviously would be important when going before a jury and counsel seeking damages for his client. Okay. So that's why Dr. Mars was in there. So that's why it was later, because I wanted to take Dr. Rivers to see if the opinions changed. Obviously he's changed his opinions by 5%. And that we know numbers are very important when it comes down to damages. Hence why that's why it took me that time. I would not have done it had it not come out. But also this was never disclosed. As to left shoulder permanency pain complaints, again, all the doctors have testified that pain is not something that they can objectively find. It is something that a patient complains of. So was it necessary to supplement Dr. Mars' opinion when it really didn't change with respect to permanency? Supplement his opinion, in my opinion, yes, based on Dr. Rivers' testimony and this new evidence. For me to, for the doctor, not myself. For the doctor to determine whether or not the opinions had changed, you know, with this deficit. Whether or not this new injury also had any effect. Because it wasn't only that he got hit by a medicine ball and his head hit the ground. It was also that he felt on his left hand outstretched. Which could potentially have affected the left shoulder. We are here to discuss left shoulder and headaches. And the plaintiff suffered an injury in June of 2023, which was not disclosed until defense subpoenaed it. And this is months before trial. So, yes, there was some, unfortunately, yeah, I can admit, untimely disclosure of information and documents. But it was the information that was provided. And I had supplemented it as quickly as I could, of which counsel was aware of. Go ahead. Well, didn't, I understood Dr. Mara opined that the loss, there was no loss of strength documented by, I think it's Dr. Rivers, but the permanency doctor. Yes. And so that was a supplement to his previous opinions. It was not much different, but it certainly was a criticism, I guess, of the permanency exam by Dr. Rivers. And from your point of view, would have tended to undercut Dr. Rivers' opinions. That was the argument plaintiff was making in his brief with respect to that. Now, and the one thing he fails to address is the fact that Dr. Rivers discussed strength of the left shoulder in his discovery deposition. Further, Dr. Mara discussed strength in his discovery deposition as well, and it is cited in the record. Furthermore, that strength discussion, while he did not put it in the first report and he put this in the second, that being the one issue of contention of which counsel has, the court had found when he had filed his motion for, to strike defendant's supplemental rule 213, he had stated that he did, furthermore, that Mara did not change his opinions, and he found that to be illogical, poorly. And I would like to also put it, you know, just for the record, too, the fact that in one instance, counsel argued in his motion to strike defendant's supplemental rule 213, originally, that Dr. Mara has new opinions regarding the strength. This needs to be, you know, you have to deny it, strike this. It's not going to be allowed. And then in another instance in his motion for reconsideration of that motion to strike is stating he had no opinions. So based on this, you shouldn't allow this testimony at all. It's either here, either or. Did you have any affirmative evidence when you denied the request to admit? I did. And as to the denial of the request to admit, sorry, one second. As to the denial of the request to admit, I had discussed Dr. Sidlar, who is an orthopedic doctor, that being from Fox Valley Orthopedics. I discussed it ad nauseum in my brief in response to both motions for summary judgment, as well as my plaintiff's motion for reconsideration in regards to the request to admit, which is why that's an issue, or that's why those two are discussed. And in there, I discussed Dr. Sidlar testifying when asked about the disc bulges, when asked about the left bicipital tendinitis, and that treatment, and whether or not it was related to the motor vehicle accident of which he was finding he did not know. And that's found in the common law record 1172. Furthermore, Dr. Sidlar, his testimony alone and his request to admit that counsel, you know, discusses in his motion for summary judgment, it's one. And that being the RTA 8. And to be fair, even in his brief, he doesn't discuss which RTA of which I denied improperly and without a good faith basis to do so. And I think that that's important because he's asking the court to find that. But I still address it. And that was only one being that total amount of the damages. If I'm able to show a good faith basis as to any doctors stating that that was not related or that there is a question of material fact of which this court found, then I have a good faith basis to deny that total amount. In Fox Valley Orthopedics, medical records, I'm sorry, medical bills are, and you can find that in C1565 of the record, it's $5,070. That's an amount. That's the amount of the damages here. And I had a good faith basis to deny that request to admit. May I have your seat? And as to the plaintiff, I'm sorry, defendant failing to timely disclose Dr. Murrah's supplemental, I did file Motion 183 for that extension of time. I will not state that discovery did not have a closure date. Of course it did. And I filed my rule 183 of which was granted. And based on that, it wasn't known timely when I had supplemented Dr. Murrah's report as well as my 213, just what it was that he was going to be testifying to as an expert, as I have to. Do you have any questions? No. And I believe, I'm just trying to see if there's anything else.  And just for the reasons argued here today and reasons previously articulated in our briefs, in my brief, in the arguments made in the common law record and the reporter proceedings, I ask that you affirm the court's decision on all three issues. Granted, counsel, and I'll just put, stated there were only two primary issues. Obviously there were three issues that are listed here or that were listed in his brief of which we do discuss. I just will put really quickly also for the record, in one of the issues, counsel does argue that there was a jury instruction that I guess was missed of some sort. There was never, he doesn't discuss any jury instruction in his brief. Just ask that that not even be considered as there's nothing in there to state that, yeah, plaintiff argues that the court ignored jury instructions but failed to cite to what jury instructions they had ignored. And this goes to his primary issue of the court erring in denying plaintiff's motion for JMOV. Furthermore, plaintiff in one also argues that the court trespasses found into advocacy, advocating for the defendant when it ruled upon objections made during defendant's expert, Dr. Marra's almost six-hour evidence deposition. And per Camp v. Price, P-R-E-I-S, court can sue a plaintiff's strike testimony as long as the judge acts fairly and without bias. There's no showing that the judge did not act fairly or that he acted in any way that he was being biased. In that section, strike stricken, being reported proceeding 1675 to 1677, which the appellant took issue with, he argued that it supported plaintiff's wage loss claim as Dr. Marra testified after being asked generally that patients have to travel to health care providers. However, in his own brief and here in court, plaintiff has been arguing that plaintiff's testimony alone is enough. And that is the reason as to why the jury should have awarded him damages for lost wages. I thank you for your time. Thank you, Ms. Perez. Thank you. Mr. Newman. Talk to us about that jury instruction. Which jury instruction? The jury instruction issue that Ms. Perez indicated that you never, you brought it up but never really argued it. I did not argue it. Okay. But I want to correct a few things that were said. First, I'm going to go back to this notion of a second concussion. Luckily, we have a record in this case, and I've cited the record. What counsel just said again, and I don't mean to be crass, is false. Mr. Grebecki was not diagnosed with a second concussion in the records. And in the testimony, he wasn't diagnosed either. And he wasn't told that either. So that's just not true. Also, I think that the notion of judge, fetus, trial judge in this case, making rulings on objections that were never made in striking testimony. That's part of the record, too. Now, I could have argued a million things on the appeal, but I know better because there's no time to do that. But that's true. Also contained in the records is at trial, and it's in the records, the first, not the, I'll call it pre-trial, going over jury instructions. The judge threw a deposition transcript at me. I'm not going to say at me, but threw it because he was mad at me because I had asked the counsel, why are you presenting a deposition transcript to the court? And you didn't provide a copy to me. That's ex parte, which is textbook ex parte. And the judge got mad at me, saying, why didn't you just go by it? This was a deposition that was taken the night before, I think, which was kind of the problem here. The disclosures of the expert, we took the evidence deposition. Is all of this in the record? It is absolutely in the record. But is it in your briefs? No, I'm just mentioning it because counsel mentioned it. So let's stay on that. I agree. I want to get to the request to admit. And let's talk about just one thing. You asked about evidence. I'm just going to put one of the treatments out. I served the defendant a request to admit that the physical therapy was related to the accident, which they denied. The physical therapist testified that all physical therapy was related to the accident back in 2017, 2018, first deposition, as did Dr. Rivers, those two depositions. They then hired an expert. And this, again, is in the record, in the report. Their own expert said that the physical therapy was related to the accident. Their own expert said that the physical therapy and that the care that was provided by the orthopedic. So those two things, the orthopedic and the physical therapist, every single health care provider. Because even Mr. Burdecki testified they were related to the accident. Because he said, I asked him, why did you vote him? Because I was injured from the accident. So every witness testified to that. There's no legal room on that. And as you point out, you asked if there was anything when she answered, when the defendant denied that, were there any facts present? I didn't hear her describe what fact it was. It certainly wasn't presented in the record at trial. She presented no evidence at trial on that. And that's the whole reason Rule 191 matters. I only have a little over a minute. I want to talk about the expert disclosure, the supplemental. Supplemental. Again, we have a record. I was having a hard time hearing the counsel because the microphone was going back there, about when this was, when Dr. Rivers' final examination was disclosed. It was disclosed the week that he had the examination. The visit was disclosed. She's right. I didn't have the records. I found out from my client on that same day, but I think it was the next day, sent an e-mail to her, hey, let you know. And by the way, I also told the court and her that this was going to happen because it's required to happen. So I said, this is going to happen. I'm going to do it in December. We're waiting for a trial date. And with COVID, everything was going so long. So I had to wait and wait and wait. But the opinion itself, Dr. Morrow, when questioned in his evidence deposition that we took on the eve of trial, said several things which just completely defeat the entire argument she's making. One, nothing in the new opinion, nothing in Dr. Rivers' visit changed his opinion. He said that unequivocally. Was that prior to him having the whole medicine ball? That was in his evidence deposition. So that was his evidence that went to the jury that night. That was his evidence that was taken immediately prior to trial. Is there anything that was disclosed to you by Dr. Rivers that changed your opinion? And the answer was no. And then when asked about this specific opinion, which you're on the testifying to, which was challenging the veracity of Dr. Rivers' examination, I asked about the structure. Is this an opinion that you held when you gave your initial disclosure in your original deposition? His response was yes. I forgot. I think that's a quote. I forgot to include it or something to that effect. Did it come up in his first death? It did not come up in his first death. Contrary to what counselor says, it wasn't. Then let me move on. Didn't the trial judge say that was a logical corollary? Excuse me. I'm asking if the trial court said that. Let me just finish. I'm not asking if you agree with the trial court. Do you see the difference? I do see the difference, and that was going to be my response. I do recall the judge saying something to that effect. And my response was exactly the same response. How is that a logical corollary? It's something that's completely different. Can I ask you, what's the standard review on that? I think that would be an abuse of discretion. That's kind of one of those things that the judge has a lot of authority in discovery matters. But even if that were the case, and here's what the judge, and I will say this, the judge recognized, I think to a certain degree, because he has suggested, you know, we have rules. What is that ruling? I mean, it's a very, you know, the six factors, six Sullivan factors. It's a very complex ruling on whether or not to grant or deny. I mean, first you have to prove a violation, and I'm not sure you have. But assuming there's a violation, it's not automatically barred. You have to apply the six Sullivan factors. And I'm not sure if we ran it through the Sullivan factors, we'd be aware of how much prejudice there was to you or how surprised you were. I'm standing here and I can tell you I was very surprised. You do have a surprised look on your face. Yeah, I was very surprised. I'm not sure that's what the case is. But let me say this, and I know I'm out of time here. I originally, if you look at the record, when the disclosure was made, untimely without leave of court, which it was, then when I filed the motion, she actually then filed a motion for leave to file it once the judge granted it. But originally it was filed without leave of court, and that was just the disclosure. When I got the disclosure and I read it, I filed an immediate motion to strike, saying there's no change in the opinion. Dr. Rivers' opinion didn't change at all. Well, then how can you claim surprise? How can I claim what surprise? How could you claim surprise if there's no change in his opinion? No, there was no change in Dr. Rivers' opinion. There was a change in Dr. Murrow's opinion, which is why I moved to strike it. When I moved to strike it – I understood Dr. Rivers initially had said – Five percent? Yes. Five percent and then testified that it was a distinction, it was a difference without a distinction. Who testified to that? Dr. Rivers did. He said that there was no – I mean, I just could not – Dr. Murrow? Dr. Murrow testified to that as well. When asked is there any distinction between five percent and ten percent as it relates to your opinion, he said no. And then a follow-up question, is the reason because you believe that it's zero percent? And he said yes. There was no legal basis whatsoever for there to be a second opinion out there. Their own witness testified, which is how this came down. I filed originally a motion to strike the written disclosure. The judge denied it and took the evidence deposition on the eve of trial, the same week of trial, if I recall. And then the day of trial, I got the transcript in and filed another motion and said, here's what he actually said because the judge said – well, the judge said what the counsel just said. Oh, well, there's obviously a reason here. We went from five percent to ten percent, which is what the judge said. But then we faced with the testimony that that didn't matter at all. It was just a subterfuge to get the opinion in that he forgot to put in months earlier. I didn't figure that the judge was going to say, well, yeah, that seems – because it's on paper. Dr. Long testified. Everything that counsel said with the idea of I need to change this because of was refuted by her own witness in the evidence deposition. And so I figured that, okay, that's not coming in. That's kind of – in my mind, that's a softball. And the judge, no, I'm going to stick it. Then when I got the – you know, I got heated like I'm getting heated now because to me, that's the – you know, as an attorney who's been practicing a long time, you know, all of us have been practicing a long time. That, to me, is a softball. You know, that should not have come in. Now, I understand – I'm going to ask you to wrap up. Yeah. And I understand that – I understand what Your Honor is saying about, like, what does that ultimately mean. So many factors. Yeah, I understand that. But I think that applies here. I don't have – but here's what my request for relief is, which is in my brief. I would like the court to make a determination on the request to admit facts. I'd like those facts deemed admitted for the reasons that I've said. And I'd like the fees associated with that. There's no reason to spend more than $30,000 in this case to prove that medical records, which everybody agrees were related to the accident, were somehow related to the accident, everything that had to happen there. That was unnecessary. And then the J&OB, same thing. There were no facts presented with the lost wages, the permanency of the injuries that I described, the shoulder and the headaches. There was no evidence presented contrary to all of the doctors who testified. And for those reasons, I'd ask that the court reverse the trial. The court set this trial on damages only, on remaining damages, non-economic damages. The economic damages, I think the court can enter. That I've requested. Thank you. Thank you, Mr. Jones. Thank you both for your arguments here today. We appreciate your professionalism. We're going to take this case under advisement, render a decision in due course. The court will be in recess until our next case.